198

TEX-O-KAN MILLS CO., d/b/a Morton
Milling Co.
v.
HIGGINS, INC., d/b/a Las Americas
Steamship Line.
No. 1371.

United States District Court
E. D. Louisiana,
New Orleans Division.
May 29, 1959.

James J. Morrison, Thomas B. Wheeler, New Orleans, La., for libelant.

Chaffe, McCall, Toler & Phillips, Leon Sarpy, New Orleans, La., for Gonzalo Abaunza, Jr.

Montgomery, Fenner & Brown, New Orleans, La., Gus Baldwin, Jr., Slidell, La., Arthur B. Hammond, Jr., New Orleans, La., for respondent.

CHRISTENBERRY, Chief Judge.

The foregoing matter having been tried to the Court without a jury, the Court having heard evidence and the argument of proctors, and having taken time to consider the matters, hereby makes the following findings of fact and conclusions of law:

Findings of Fact.

1.

At all material times libelant, Tex-O-Kan Mills Co., dba Morton Milling Company, was and is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware; and respondent, Higgins, Inc., dba Las Americas Steamship Line, was and is a corporation duly organized and existing under and by virtue of the laws of the State of Louisiana.

2.

At all material times respondent, Higgins, Inc., dba Las Americas Steamship Line, operated the M/V Angelle Higgins from New Orleans, Louisiana, to Bluefields, Nicaragua, as a common carrier of cargo by sea. It engaged Gonzalo Abaunza, Jr. as its general steamship agent at the Port of New Orleans for Las Americas Steamship Line, and held him out to the public, including libelant, as its gen-

eral steamship agent. (Higgins Answers to Interrogatories No. 3)

### 3.

On November 27, 1946, libelant, and respondent acting through its general steamship agent, Gonzalo Abaunza, Jr., entered into written shipping Contract No. 113 (annexed to libel) under which respondent agreed to carry libelant's cargo of 139 tons of flour per M/V Angelle Higgins from shipside New Orleans to Bluefields, Nicaragua, in consideration of the payment by libelant of an agreed freight (Libel III, admitted by Answer I and Interrogatory Answers 3, 4 and 5).

### 4.

Las Americas Contract No. 113 contains, among others, the following provisions with respect to libelant's cargo of flour:

"To be delivered to suit steamer M/V Angelle Higgins * * *

"This contract is made upon the express condition that it is subject to all the clauses and conditions in the Ocean Bill of Lading used by the vessel, which Bill of Lading is made a part of this contract * * *"

### 5.

The ocean bill of lading referred to by Las Americas Contract No. 113, and incorporated into the contract by the terms thereof, expressly provides that the cargo contracted for will be:

"Received * * * by the Las Americas Steamship Line (The term Carrier hereinafter used intending said Company and * * * any substituted Carrier) * * * To Be Transported by the steamship named * * * subject to substitution (* * * or any substituted * * * vessel * * * at the inception * * * of the entire service) * * * to the destination of the goods, subject always * * * to the Terms of This Contract Which are Hereby Mutually Agreed Upon as Follows:

"9. The carrier shall have liberty, in its discretion before * * *

shipment or loading, to substitute, or ship the whole or any part of the goods, by any other steamship * * * subject * * * to the provisions of the usual form of bill of lading of such carrier * * *." (Emphasis Not added.)

### 6.

By letter of Las Americas Steamship Line dated December 6, 1946, (Exhibit B) Gonzalo Abaunza, Jr., "Agent for Las Americas Steamship Line" confirmed

"* * * that our booking Contract No. 113 * * * originally booked for the M/V Angelle Higgins * * * for Bluefields * * * *has been transferred* to the M/V Trader Horn * * *" (Emphasis added.)

### 7.

At the time the transfer of vessels was made, and thereafter during the period the vessel was being loaded and for some days after the vessel sailed with libelant's flour, libelant and its freight forwarders who acted as agents for libelant in New Orleans did not know the M/V Trader Horn, or her owners or operators, and were never informed by Abaunza, Las Americas, Higgins, or any one else that the M/V Trader Horn was actually owned and operated by Mick Trader Lines (Answers to Interrogatories Nos. 7 and 8).

### 8.

Libelant and its New Orleans Freight Forwarder, A. E. Hegewisch, were at all material times led to believe, by respondent, through its agent, Abaunza, and did believe, that the M/V Trader Horn was a vessel of Las Americas Steamship Line, and Hegewisch even prepared the bills of lading for carriage of flour by the M/V Trader Horn on Las Americas Steamship Line's bill of lading forms.

### 9.

Libelant's cargo was assembled for loading, and loaded aboard the M/V Trader Horn, from the wharf assigned to Las Americas Steamship Line at Florida Avenue in New Orleans between December 18 and 24, 1946. In all instances de-

livery orders for such cargo and receipts therefor were given to the railroad and to libelant's freight forwarder, A. E. Hegewisch, on stationery of Las Americas Steamship Line over the signature of "G. Abaunza, Jr., Agent, Las Americas Steamship Line".

10.

On or about December 18, 1946, respondent instructed T. & P. R.R. to deliver libelant's shipment of flour, moving under contract No. 113, to the M/V Trader Horn approving the delivery by T. & P. R.R. of said flour to the Florida Avenue Wharf, Sections 11 to 24, at the Port of New Orleans where the Trader Horn's cargo was being assembled; and respondent there received between December 18th and 24th, 1946, a quantity of 1,550 200-lb. bags of wheat flour owned by libelant, all in good order and condition, to be carried from the Port of New Orleans to Bluefields, Nicaragua, per M/V Trader Horn, for delivery there to the order of libelant in like good order and condition as when received by respondent at the Port of New Orleans.

11.

Libelant's cargo was in good order and condition when laden on board the M/V Trader Horn.

12.

The M/V Trader Horn sailed from New Orleans for Bluefields on December 24, 1946, with libelant's cargo aboard. Prior thereto, A. E. Hegewisch, libelant's freight forwarder, had prepared ocean bills of lading for libelant's cargo on Las Americas bill of lading forms and sent same to respondent for execution. After the vessel had sailed and was already in the Gulf of Mexico en route to Bluefields, the ladings were returned to Hegewisch transferred to "Mick Trader Lines" bill of lading forms.

13.

The Mick Trader Lines' bills of lading covering the cargo in suit were substituted by Abaunza and show on their face that they were issued in conformity to Las Americas Contract No. 113.

14.

At the time the Mick Trader Lines' ladings were tendered to libelant it would have been useless to object because the M/V Trader Horn was by then in the Gulf of Mexico, well on its way to Bluefields.

15.

In accepting the Mick Trader Lines' ladings libelant

(a) considered same as issued in conformity with shipping contract No. 113;

(b) did not release or intend to release respondent from its said shipping contract No. 113;

(c) did not substitute nor intend to substitute Mick Trader Lines for respondent as carrier of its cargo.

16.

Thereafter respondent and the M/V Trader Horn carried libelant's shipment of flour from the Port of New Orleans to the Port of Bluefields, Nicaragua, where the M/V Trader Horn discharged said shipment of 1,550 bags of flour, all of which were seriously injured and damaged by sea water.

17.

The said damages to libelant's cargo amounted to $24,188.67.

18.

Libelant performed all of the conditions precedent on its part to be performed under the shipping contract and bills of lading.

19.

In 1946, and prior to the loading of libelant's cargo, the M/V Trader Horn was converted from a war ship to a two-hatch cargo vessel at New Orleans, which involved the insertion of steel hatches forward and aft in a wood deck.

20.

After said conversion:

(a) no hose, hydrostatic, or other tests were made of the deck to ascertain whether the wood deck or the wood deck where it joined the steel hatches was watertight (Lading, p. 19);

(b) The Trader Horn was not given a dock or sea trial nor were its engines inspected and tested;

(c) The seaworthiness of the M/V Trader Horn had not been passed upon or approved by any Surveyor nor had any load line been established or approved.

21.

A load line certificate effective as to the voyage complained of had never been obtained for or on behalf of the M/V Trader Horn, and she sailed from New Orleans without a load line.

22.

The voyage involved in this action was the first on which the M/V Trader Horn transported cargo after its said conversion.

23.

There was no cement or oakum on board the M/V Trader Horn when it got underway and the hawse pipe opening had not been blocked up or cemented watertight before the vessel got underway. Rivet holes and/or defective rivets were present in the bulkhead separating Hold No. 1 from the forepeak.

24.

The forepeak was not watertight because of a defective gasket on the manhole leading from the deck to the forepeak and because of open hawse pipes.

25.

During the course of the said voyage the Trader Horn took on considerable sea water in both holds through open seams and leaks in the deck and through the hawse pipe opening. (Log of S.S. Trader Horn, Levy).

26.

As early as hour 1600 on December 26th when the wind was only Force 4 the vessel labored and shipped water forward; at 0400 on December 27th the vessel hove to to pump out forepeak because she was taking water through the hawse pipe, at that time there was a S.E. Breeze of Force 6; at 0600 on December 28th, when there was a S.E. Breeze of only Force 4 to 6, the vessel labored heavily, hove to, found two feet of water forward, water was leaking through an *open seam* on the deck forward and amidship of No. 1 hatch and cargo had already been damaged; on January 3rd at 1530 the governor jammed on the starboard engine requiring same to be stopped; and five minutes later, while the starboard engine was incapable of operating, the Trader Horn touched bottom (Log).

27.

The M/V Trader Horn was unseaworthy at the commencement of the voyage in question.

28.

Respondent, Higgins, Inc., exercised no diligence to see that the Trader Horn was seaworthy at the commencement of the voyage.

Conclusions of Law.

1.

This Court has jurisdiction over the subject matter of this suit and the parties herein.

2.

Gonzalo Abaunza, Jr. was general steamship agent of respondent in New Orleans.

3.

As agent for respondent, Gonzalo Abaunza, Jr. entered into and made shipping contract No. 113 on behalf of respondent.

4.

 Respondent under Contract No. 113 had the right to substitute the M/V Trader Horn and Mick Trader Line for the M/V Angelle Higgins.

5.

Gonzalo Abaunza, Jr. had actual authority, as agent for respondent, to substitute on behalf of respondent the M/V Trader Horn and Mick Trader Line for the M/V Angelle Higgins under contract No. 113. Restatement of the Law of Agency, Sect. 35, 50; LSA–Civil Code,

Articles 3000, 3021; 2 American Jurisprudence 86.

6.

The said substitution was incidental to and expressly contemplated by Shipping Contract No. 113.

7.

The M/V Trader Horn was substituted for the M/V Angelle Higgins under contract No. 113 and said substitution bound respondent as carrier.

8.

Respondent has all of the responsibilities and liabilities of carrier of the shipment of libelant's cargo per M/V Trader Horn.

9.

The substitution of the M/V Trader Horn for the M/V Angelle Higgins and the issuance of and acceptance by libelant of Mick Trader Line bills of lading did not novate respondent's shipping contract No. 113.

10.

The substitution of the M/V Trader Horn for the M/V Angelle Higgins and the issuance of and acceptance by libelant of Mick Trader Line bills of lading did not merge respondent's shipping contract No. 113 into the bills of lading as issued.

11.

Shipping contract No. 113 was a special contract between libelant, as shipper, and respondent, as carrier, and expresses the real contract of carriage which regulated the shipment and loss here involved. The Mick Trader Line's ladings were issued pursuant to shipping contract No. 113.

12.

Respondent is liable as carrier.

13.

The M/V Trader Horn was unseaworthy at the time of, and prior to, the commencement of the voyage from New Orleans to Bluefields.

14.

At the time of the commencement of said voyage the M/V Trader Horn was unseaworthy in the following respects:

(a) Her decks were not tight and proved leaky, particularly where new steel hatch combings had been set in the wooden deck during her conversion.

(b) Defective rivets, rivet holes, or both, were present in the bulkhead separating Hold No. 1 from the forepeak.

(c) The forepeak was not watertight because of defective gasket on the manhole leading from the deck to the forepeak and because of open hawse pipes not blocked up or cemented at the commencement of the voyage.

(d) She sailed without a loadline or a loadline certificate.

(e) She was overloaded.

(f) She sailed with insufficient freeboard.

(g) She was not properly supplied and failed to carry oakum to caulk leaky seams at sea to protect cargo; and she carried no cement to block up and make watertight the hawse pipe opening.

15.

The loss and damage to libelant's cargo was caused by the said unseaworthiness of the M/V Trader Horn.

16.

Respondent, its agents, servants and employees failed to exercise any, or due, diligence to make the Trader Horn seaworthy at the commencement of the voyage or to avoid or prevent the loss.

17.

The owners and/or agents of the M/V Trader Horn failed to exercise due diligence to make the Trader Horn seaworthy at the commencement of the voyage or to avoid or prevent the loss.

18.

The Trader Horn violated the Loadline Statute, 46 U.S.C.A. § 85 et seq., by sailing without a loadline or loadline certificate

19.

The loss and damage to libelant's cargo did not result from an "excepted cause" for which respondent, as carrier, would have been exonerated.

### 20.

The conversion of the Trader Horn was not carried out under the supervision of Laing or any other qualified surveyor; the survey made by Laing was a "condition survey", made after conversion had been completed; it was not a Lloyds Survey; no tests were made by Laing of the seaworthiness of the Trader Horn.

### 21.

The survey made by Laing was insufficient (a) to determine the seaworthiness of the Trader Horn, or (b) to meet the requirement of due diligence.

### 22.

Respondent is liable for the loss and damage to libelant's shipment of flour.

### 23.

The loss and damage sustained by libelant's shipment of flour amounted to $24,188.67.

### 24.

Higgins, Inc., as owners of Las Americas Steamship Line is liable to Tex-O-Kan Flour Mills Co. in the sum of $24,188.67, with interest, costs and disbursements.

### Final Decree.

A decree previously having been entered herein on January 8, 1959, and thereafter a motion on behalf of libelant to correct and amend the Record and the Decree so as to show and make Higgins, Inc. the real and actual respondent in the captioned cause and to substitute the name of Higgins, Inc. in the place and stead of Las Americas Steamship Line, Inc., in the Record and Decree having been made and submitted, and there being no objection thereto, after due consideration thereof,

It is ordered, adjudged and decreed that the Record and Decree in the captioned cause be and the same is hereby amended and corrected so as to show and make Higgins, Inc. the real and actual respondent; and

It is further ordered, adjudged and Decreed that judgment be, and is, hereby entered in favor of the libelant Tex-O-Kan Flour Mills Company, doing business as Morton Milling Company, in the amount of $24,188.67, against Higgins, Inc., doing business as Las Americas Steamship Line, together with interest from date of decree, until paid, and costs.